***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of Chief Deputy Commissioner Taylor and enters the following Opinion and Award:
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. Plaintiff-Employee was employed by Defendant-Employer H.K. Porter Company from 1964 until 1968.
2. The parties are subject to the North Carolina Workers' Compensation Act with Defendant-Employer employing the requisite number of employees to be bound under the provisions of said Act.
3. Defendant-Employer H.K. Porter Company had workers' compensation insurance coverage with Defendant-Carrier, ACE USA from 1964 until 1969.
4. The parties stipulated the following into evidence as Stipulated Exhibit 1: Industrial Commission forms, discovery responses, social security printout, death certificate, letters testamentary, correspondence and November 1995 asbestos survey.
5. The parties stipulated into evidence as Stipulated Exhibit 2, six pages of medical records from Drs. Bower, Mills, and Orr.
6. Plaintiff's contested issues for hearing:
 a) Did decedent suffer from a compensable occupational disease, to wit: asbestosis?
 b) Did decedent suffer from a compensable occupational disease, to wit: colon cancer metastatic cancer of the liver?
 c) Did a compensable occupational disease contribute to the cause of death of the decedent?
 d) When was the decedent last injuriously exposed to the hazards of asbestos?
 e) What benefits, monetary and/or medical, is decedent's estate entitled to receive, if any? *Page 3 
 f) Whether the compensation due to decedent-dependents shall be increased by ten percent pursuant to N.C. Gen. Stat. § 97-12?
 g) Whether decedent-dependents shall be entitled to attorney's fees for the unreasonable defense of this matter?
 h) Whether plaintiff-decedent shall be entitled to receive compensation pursuant to N.C. Gen. Stat. § 97-24(31)?
 i) Was decedent disabled due to his occupational illness and what was the period of that disability?
 j) What benefits is decedent's estate entitled due to his disability?
 k) What, if any, attendant care benefits are due?
 m) Whether any defendant has waived its right to deny and/or defend this claim based upon a failure to comply with the terms and conditions as set forth in N.C. Gen. Stat. § 97-18 and Industrial Commission Rule 601?
 n) What amount in death benefits shall the dependent receive?
 o) What is the appropriate compensation rate?
7. Defendants' contested issues for hearing:
 a) Whether Plaintiff had asbestosis?
 b) When was Plaintiff last injuriously exposed to asbestos if ever?
 c) Whether Plaintiff's alleged asbestos condition is related to his development of colon cancer?
 d) Whether Plaintiff's claim is time barred under the applicable statute of limitations?
 e) What benefits, if any, is Plaintiff entitled to? *Page 4 
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Mr. Virgil Price was a co-worker of Mr. Charles Tyson during Mr. Tyson's period of employment. Mr. Price described in detail how the H.K. Porter facility was an asbestos manufacturing facility. Mr. Price worked at the H.K. Porter facility from March 1962 until March 1999. During that time period the facility changed ownership names several times but the production process remained the same. Mr. Tyson worked for Defendant-Employer, H.K. Porter Company, (hereinafter "H.K. Porter") from 1964 to 1968 at the same time as Mr. Price. This facility produced asbestos brake pads and insulation.
2. Mr. Price's first job was as a "fixer." This job was in the maintenance department and required Mr. Price to work throughout the facility fixing production machinery. This job was the same job held by Decedent-Employee, Mr. Charles Tyson.
3. The production process began with 90-pound bags of raw asbestos delivered to the facility in a rail car. The facility would use approximately 25 to 30 of the 90 pound bags of asbestos a day. The bags would be taken to the preparation room on a pallet to start the process. In the preparation room there were a number of large vessels known as "hoppers." The raw asbestos would be placed in one hopper and would be dispensed in a predetermined amount to be mixed with other fibers such as rayon. At times the mixture would be almost pure asbestos.
4. The mixture of asbestos and other fibers would then go into a cylinder where it would be mixed. Throughout this process dust containing asbestos fibers is released into the air. Once the raw asbestos mixture came out of the cylinder, it would be hand packed into boxes and *Page 5 
sent to the carding room. Again, this hand packing process would create a large amount of dust as the asbestos mixture is being transferred and packed.
5. Once the mixture is packed, the boxes are taken to the card room where the mixture is placed on a carding machine. The carding machine is two metal rollers turning quickly into one another. Their job is to pull the asbestos fiber mixture into strands with the fibers combed in the same direction. There would be approximately 40 card machines working at the same time. As these machines operated large amounts of dust would be created. Dust came out of the sides and from the bottom of these machines. Enough dust was created that it was difficult to see across the room.
6. Once the asbestos mixture was pulled through the carding machines, the material was taken to the spinning room, where the mixture was put on spools on a machine. Each machine would have about 40 spools from which a thin piece of asbestos thread was pulled. The machine would then "spin" and twist the 40 small threads into one larger thread. The spinning heads were moving "real fast" and as they would spin asbestos dust would come off the thread and go throughout the area.
7. After spinning process, the asbestos mixture goes to the weave room. Thread was woven into asbestos cloth. It was very dusty in the weave room. At the end of the shift dust would cover everything including the lighting. If you touched the lighting the dust would fall all over you. The lights would be clean at the beginning of the shift and by the end of the shift, they would be covered in asbestos dust.
8. Mr. Price knew the Decedent-Employee, Tyson, when he started working there. He knew him well; he and Mr. Tyson did the same type of work. He would see Mr. Tyson throughout the day. Mr. Price testified that Mr. Tyson worked in all the areas that Mr. Price *Page 6 
discussed and described 100% of the time. At the end of the shift, Mr. Tyson's clothes would be covered with asbestos dust. Mr. Tyson was injuriously exposed to asbestos throughout his employment with Defendant-Employer. Mr. Tyson was last injuriously exposed to asbestos while in the employment of Defendant-Employer.
9. Defendant called no witnesses to rebut any of the testimony of Mr. Price.
10. Subsequent to the hearing before the Chief Deputy Commissioner, Plaintiff's counsel took the deposition of Christopher M. Burgess. Mr. Burgess is an insurance adjuster and the individual that verified the interrogatories for the Defendant. Throughout the deposition, Plaintiff's counsel repeatedly asked Mr. Burgess of any evidence that Mr. Tyson was not exposed to asbestos; no evidence was offered by Burgess.
11. The Chief Deputy Commissioner found that Defendants admitted in their brief to the Chief Deputy Commissioner that Plaintiff produced sufficient evidence to show that he was exposed to asbestos during his employment with Defendant-Employer. This finding was not appealed by either party.
12. Plaintiff was last injuriously exposed to the hazards of asbestos during his employment with Defendant-Employer.
13. Dr. Arthur Frank was deposed subsequent to the hearing before the Chief Deputy Commissioner. Dr. Frank received his medical degree from Mount Sinai School of Medicine in 1972. In 1973 he began work at the National Cancer Institute as a Commissioned Officer in the United States Public Health Service, a Commission he has held for over 35 years.
14. Dr. Frank became board certified in Internal Medicine in 1978, and Occupational Medicine in 1979. In 1977, he was awarded a Ph.D, in Biomedical Science for his work studying the effects of asbestos on tissue. Dr. Frank explained that the field of Occupational Medicine is a *Page 7 
discipline that looks at types of occupational exposures and tries to study their relationship to disease.
15. Dr. Frank was the chairman of the Department of Preventive Medicine and Environmental Health at the University of Kentucky College of Medicine. He is currently the Chairman of the Department of Environmental and Occupational Health at the Drexel University School of Public Health. Dr. Frank has served as an advisor to OSHA, EPA and NIOSH, as well as the governments of Brazil, China, Israel, and Egypt, on asbestos related issues. Dr. Frank has published a number of articles and presented numerous articles dealing with asbestos related issues. Dr. Frank has testified on several occasions before the North Carolina Industrial Commission.
16. Dr. Frank gave the following opinions during his deposition:
 Q. And, Doctor, turning to Mr. Tyson's case, if you would, I would like you to assume that the Commission finds that Mr. Tyson was exposed in his employment with a company called H.K. Porter to asbestos during the manufacturing of processing asbestos products from 1964 to 1968. Do you have an opinion, Doctor if that exposure would have significantly contributed to Mr. Tyson's development of colon cancer?
 A. I do have an opinion, and my opinion would be that exposure at H.K. Porter was a significant contributing cause to his developing his colon cancer.
 Q. And, Doctor, I want to stick with that employment, if you would. If the Commission so finds that Mr. Tyson was exposed to asbestos during his employment with H.K. Porter during the manufacturing process of asbestos-containing products, do you believe that exposure would have placed him at an increased risk of developing colon cancer greater that the general public?
 A. I do have an opinion, and certainly, he would have been placed at an increased risk as would anybody with such *Page 8 
exposure. But, specifically, in the case of Mr. Tyson, not only did he have an increased risk, but he ultimately developed the disease.
17. Dr. Frank bases this opinion on the history of asbestos exposure Mr. Tyson received at H.K. Porter wherein Mr. Tyson worked with and around raw asbestos. Dr. Frank notes Mr. Tyson was not a smoker. Dr. Frank also places importance on the radiology reports he received that showed Mr. Tyson had changes associated with asbestos exposure present on his radiology, as well as the medical record history of Mr. Tyson.
18. Dr. Frank explained how the asbestos fibers arrive at the colon. Dr. Frank testified, "The clearance mechanism from the lung, which is a very good one, we get rid of about 85 or 90 percent of the asbestos that ends up in our lung tissue. One of the major routes of clearing asbestos is through the mucociliary escalator, that is, mucus cells will have the asbestos attached to it or to the mucus globules, the cells will have the asbestos attached to it or to the mucus globules, the cells have little hair-like projections called cilia, and they beat upwards, and they beat these fibers out of lung. The problem is you end up then swallowing them, and it goes through your gastrointestinal tract. They can end up in your colonic tissue. They can even penetrate through the colonic tissue into the abdomen, which is how we get peritoneal mesotheliomas, not the case that's relevant here, because Mr. Tyson didn't have peritoneal mesothelioma, he had a adenocarcinoma of the colon. But we know that asbestos gets into the tissue about which we are concerned."
19. Dr. Frank's position that asbestos can cause colon cancer is supported by a number of credible agencies. Dr. Frank indicated that it was not only his opinion but also that of the EPA, NIOSH, OSHA, and IARC [the International Agency for Research on Cancer (part of *Page 9 
World Health Organization)]. In addition, Dr. Frank cited various studies, including that of Dr. Selikoff.
20. The Industrial Commission has addressed the issue of whether colon cancer is caused by asbestos on several occasions, most recently in Hamrick v. FMC Corp., I.C. No. 394796, Ballance, McDonald, Scott, (October 6, 2008).
21. Plaintiff also took the deposition of Dr. James Johnson, a board certified radiologist, and former NIOSH B-reader. Dr. Johnson is a graduate of the Bowman Gray School of Medicine at Wake Forest University. He has been a practicing radiologist for 17 years devoting 100 percent of his time to reviewing films.
22. Dr. Johnson reviewed a chest x-ray of Mr. Tyson dated October 21, 1999. He never saw Mr. Tyson. Dr. Johnson provided a B-read of this film and found that the film showed evidence of asbestosis and asbestos related pleural plaques. By providing this reading, Dr. Johnson indicated he was not providing a diagnosis, rather simply indicating what the film showed.
23. Dr. Johnson opined that he found irregular linear opacities in the lower portions of Mr. Tyson's lungs and that this was consistent with asbestosis.
24. Plaintiff also took the deposition of Dr. Stephen Proctor. Dr. Proctor has been a board certified pulmonologist since 1990. He is also board certified in internal medicine and critical care. Additionally, he has served on the Occupational Disease Panel for the State of North Carolina.
25. Dr. Proctor opined on March 1, 2006, that Mr. Tyson suffered from both asbestosis and asbestos related pleural disease. Dr. Proctor took a work history when he interviewed Mr. Tyson that showed he was exposed to asbestos while in the employment of H.K. *Page 10 
Porter. Dr. Proctor also reviewed Mr. Tyson's radiology and pulmonary function testing. After a review of these materials, Dr. Proctor opined that Mr. Tyson suffered from pleural plaques. Dr. Proctor gave the following opinions during his deposition:
 Q. And, in Mr. Tyson's case, Doctor do you believe his bilateral pleural plaques were caused by exposure to asbestos?
 A. Yes, sir.
 Q. Okay. And his work from 1964 to 1968, do you believe his exposure during that time period significantly contributed to the development of his pleural plaquing?
 A. Yes, sir.
 Q. And, Doctor, do you believe that his work from 1964 to 1968 and his exposure to asbestosis therein placed him at a greater risk that the general public of developing the disease of bilateral pleural plaques?
 A. Yes.
 Q. And, Doctor, do you have an opinion, to a reasonable degree of medical certainty, if Mr. Tyson has asbestosis?
 A. Yes, I believe he does.
 Q. You believe he does have asbestosis?
 A. Yes, sir.
26. Defendant offered the Commission two experts, Dr. Phillip Goodman and Dr. John Craighead. Dr. Goodman is a radiologist and Dr. Craighead is a pathologist.
27. Dr. Goodman testified that in the last 5 years he has read "thousands" of films for Defendants. Dr. Goodman stated that well over 90% of the time he does not find any type of asbestos disease. *Page 11 
28. Dr. Goodman agreed that Mr. Tyson had an occupational exposure to asbestos, and he also agreed that Mr. Tyson had asbestos related pleural plaques.
29. At the request of Defendant's counsel, Dr. Goodman reviewed a CT scan dated August 18, 2006, and a CT scan dated January 25, 2007, both of Mr. Tyson's lungs. When Dr. Goodman reviewed the August 18, 2006, CT scan he found "curvilinear lining of the lower lobe." Dr. Goodman stated that asbestosis would be seen in the lower lobes of an individual and "curvilinear lines" would be how a radiologist would describe asbestos related disease finding on radiology.
30. On the January 25, 2007, CT scan Dr. Goodman reviewed, he found "ground glass opacities" and "subpleural curvilinear lines" in the lower lobes of the lungs. Again, Dr. Goodman agreed that these two findings are how a radiologist would describe asbestosis on radiology.
31. Dr. Goodman did not offer any testimony regarding Mr. Tyson's colon cancer.
32. Defendant offered Dr. John Craighead. Dr. Craighead is a pathologist. He admits he is not an epidemiologist and further admits he does not hold himself out as an epidemiologist. Dr. Craighead admitted his opinion in this matter was based on epidemiology. Dr. Craighead is not an occupational disease doctor.
33. Defendant offered the testimony of Dr. Craighead to this Commission in an attempt to show that Mr. Tyson's colon cancer was not asbestos related. Dr. Craighead was not told by Defendant that Mr. Tyson was exposed at a plant where the process used raw asbestos. Dr. Craighead stated that it would not matter to him.
34. Dr. Craighead opines that the reason he does not believe Mr. Tyson's colon cancer is related to asbestos exposure is because, in his opinion, there is no established relationship between asbestos exposure and colon cancer. *Page 12 
35. Dr. Craighead's opinions are afforded little weight because he disagrees with several noted authorities on the subject of colon cancer and asbestos exposure. Dr. Craighead's testimony is in direct contradiction to the wide body of literature from well recognized institutions, including the National Cancer Institute, the U.S. Department of Labor, and OSHA, among others.
36. Defendant asked Dr. Craighead to review certain pathology in this case. Dr. Craighead was asked to review Mr. Tyson's liver pathology, not his colon. Thus, this review is given little weight. Dr. Craighead testified that he did not see any evidence of asbestos on the liver pathology. This statement is misleading. Dr. Craighead admits on cross examination that he would not expect to see any evidence of asbestos exposure from a liver biopsy regardless of the level of exposure of Mr. Tyson.
37. Dr. Craighead does admit that Mr. Tyson has asbestos related pleural plaques, and he also admits that Mr. Tyson's colon cancer metastasized to his liver.
38. Greater weight is given to the testimony and opinions of Dr. Arthur Frank than the testimony and opinions of Dr. John Craighead.
39. Mr. Tyson died on August 19, 2007, as a result of colon cancer. Mr. Tyson's colon cancer metastasized to his liver.
40. Plaintiff, Katherine Tyson, was married to Charles Tyson at the time of his death. The two had been continuously married since 1958. Ms. Tyson is the sole dependant and spouse of Mr. Tyson.
41. Mr. Tyson had extensive medical bills associated with his illness.
42. By the greater weight of the evidence, Mr. Tyson was last injuriously exposed to the hazards of asbestos during his employment with Defendant-Employer. *Page 13 
43. By the greater weight of the evidence, Mr. Tyson contracted bilateral pleural disease as a direct and proximate result of his exposure to asbestos during his employment with Defendant-Employer.
44. By the greater weight of the evidence, Mr. Tyson was at a greater risk of the development of bilateral pleural disease than members of the general public not so employed.
45. By the greater weight of the evidence, Mr. Tyson contracted asbestosis.
46. By the greater weight of the evidence, Mr. Tyson contracted asbestosis as a direct and proximate result of his exposure to asbestos during his employment with Defendant-Employer.
47. Mr. Tyson contracted colon cancer which metastasized to his liver.
48. By the greater weight of the evidence, Mr. Tyson's colon cancer was caused or significantly contributed to by his exposure to asbestos during employment with Defendant-Employer.
49. By the greater weight of the evidence, Mr. Tyson's employment placed him at a greater risk of developing colon cancer than members of the general public not so employed.
50. Sanctions and attorney's fees are not appropriate in this matter for either party.
51. Plaintiff did not bring this action in bad faith. Plaintiff's failure to divulge expert opinions generated for litigation, when those experts are not used, is not an abuse of the discovery process and the conduct is not found to be "egregious or nefarious."
52. The Defendant did not defend this claim without reasonable grounds, and as such, the assessment of attorney's fees under N.C. Gen. Stat. § 97-88.1 is neither proper nor justified.
53. Defendants have failed to file a Form 22. The maximum compensation rate for 2005, the year of Decedent-Employee's diagnosis of colon cancer, is $704.00 per week. *Page 14 
54. Plaintiff is the surviving spouse of Decedent-Employee, and Plaintiff was the sole dependent of Decedent-Employee at the time of his death. The Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence in the record to establish Plaintiff's inability to support herself due to physical and/or mental disability, pursuant to N.C. Gen. Stat. § 97-38.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Decedent-Employee became injuriously exposed to asbestos during the course and the scope of his employment at the manufacturing facility owned and run by Defendant-Employer. Decedent-Employee sustained his last injurious exposure to the hazards of asbestos during his employment at the manufacturing facility with Defendant-Employer in the 1960's, through the last day of his employment with Defendant-Employer in 1968, while Defendant-Carrier ACE USA provided workers' compensation insurance coverage to Defendant-Employer. N.C. Gen. Stat. § 97-57. Defendant-Carrier ACE USA was the last workers' compensation insurance carrier providing insurance coverage to Defendant-Employer during Decedent-Employee's employment with Defendant-Employer, and Defendant-Carrier ACE USA is the sole insurance carrier that is liable to Plaintiff for workers' compensation benefits.
2. There is insufficient evidence in the record to establish that Defendant-Employer either caused the injury or the death of Decedent-Employee through any willful failure to comply with any statutory requirement, or through any willful failure to comply with any Order of the *Page 15 
North Carolina Industrial Commission, pursuant to N.C. Gen. Stat. § 97-12. Therefore Plaintiff is not entitled to a 10% penalty pursuant to N.C. Gen. Stat. § 97-12. N.C. Gen. Stat. § 97-12.
3. N.C. Gen. Stat. § 97-2(5) provides five possible methods of determining average weekly wages. The Commission has not been provided with sufficient earnings information from which to calculate Decedent's average weekly wage according to the first three methods set forth in N.C. Gen. Stat. § 97-2(5). Using "method four" would be the most fair and just result to both parties for determining Decedent-Employee's average weekly wage. Where for exceptional reasons the first three methods would be unfair, either to the employer or employee, the Commission may employ such other method as will most nearly approximate the amount which the injured employee would be earning were it not for the injury. N.C. Gen. Stat. § 97-2(5). Defendant did not produce a Form 22 or other evidence from which an average weekly wage can be calculated. Therefore, the Commission imputes to Decedent-Employee the maximum compensation rate for 2005, $704.00, for purposes of this Opinion and Award. N.C. Gen. Stat. § 97-2(5); See Shibli v.Miller Metals, I.C. File No. 926505, Scott, McDonald, Sellers (November 30, 2007).
4. Since Decedent-Employee's asbestos exposure at his job with Defendant-Employer caused his colon cancer, which in turn, caused his death, Plaintiff is entitled to 400 weeks of compensation at the rate of $704.00 per week beginning August 19, 2007, pursuant to N.C. Gen. Stat. § 97-38. N.C. Gen. Stat. § 97-38.
5. Plaintiff is the surviving spouse of Decedent-Employee, and Plaintiff was the sole dependent of Decedent-Employee at the time of his death. There is insufficient evidence in the record to establish Plaintiff's inability to support herself due to physical and/or mental disability, *Page 16 
pursuant to N.C. Gen. Stat. § 97-38. Plaintiff is therefore not entitled to compensation beyond the 400 weeks as prescribed by N.C. Gen. Stat. § 97-38(3). N.C. Gen. Stat. § 97-38(3).
6. The medical treatment, testing, and evaluation which Decedent-Employee received as a result of his colon cancer, asbestos related pleural disease, and of his asbestosis was reasonably required to diagnose his conditions, to effect a cure for his conditions, to provide relief from his conditions, and/or to lessen his disability. Decedent's estate, and/or Decedent's Health Insurance plan, is/are entitled to reimbursement for all medical treatment resulting from Decedent-Employee's compensable diseases of colon cancer, asbestos related pleural disease, and asbestosis, and for all medical treatment which gave relief to Decedent-Employee during the time in which he suffered from the aforementioned compensable diseases. N.C. Gen. Stat. § 97-59.
7. Plaintiff is entitled to a burial expense of $3,500.00 for the burial of Decedent-Employee. N.C. Gen. Stat. § 97-38.
8. The Defendants did not defend this claim without reasonable grounds, and as such, the assessment of attorney's fees under N.C. Gen. Stat. § 97-88.1 is neither proper nor justified. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Defendants shall pay 400 weeks of compensation at the rate of $704.00 per week, beginning August 19, 2007, to Plaintiff. The accrued compensation shall be paid in a lump sum to Plaintiff. *Page 17 
2. Defendants shall pay for all reasonably required medical evaluations, testing, and treatment resulting from Decedent-Employee's compensable diseases of colon cancer, asbestos related pleural disease, and asbestosis, according to procedures approved by the Industrial Commission.
3. Defendants shall pay a burial expense of $3,500.00 to Plaintiff for the burial of Decedent-Employee.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to Decedent-Employee's estate in paragraph one (1) above, is hereby approved to be deducted from the lump sums accrued and thereafter, every fourth (4th) payment due Plaintiff shall be paid directly to Plaintiff's attorney.
5. Defendants shall pay the costs of these proceedings, which includes a deposition expert witness fees as follows: $432.00 to Dr. Craighead, $570.00 to Dr. Frank, $430.00 to Dr. Goodman, $430.00 to Dr. Johnson and $431.75 to Dr. Proctor, if not already paid.
This the 30th day of April, 2010.
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER *Page 18 
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1